IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DAVID F. LAIRD                                                                PLAINTIFF

          v.                                    CIVIL NO. 5:16-CV-5268


NANCY A. BERRYHILL,[1] Acting Commissioner,
Social Security Administration                                               DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, David F. Laird, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claim for a period of disability and disability insurance benefits

(DIB) under the provision of Title II of the Social Security Act (Act). In this judicial review,

the Court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision. See 42 U.S.C. § 405(g).

## I.      Procedural Background:

Plaintiff protectively filed his current application for DIB on July 1, 2014, alleging an

inability to work since February 2, 2011,[2] due to the following conditions: ulcerative colitis,

Crohn's disease, depression, degenerative disc disease, spondylosis, ileostomy bag, social

anxiety, and cholecystitis (inflammation of the gallbladder). (Tr. 134-135, 152-153). For DIB

purposes, Plaintiff maintained insured status through December 31, 2016. (Tr. 134, 152). An

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as
Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2] At the hearing held before the ALJ, Plaintiff amended the disability onset date to October 5, 2012 (the date after denial
from a previous hearing). (Tr. 75).

1

administrative hearing was held on December 8, 2015, at which Plaintiff appeared with counsel and testified. (Tr. 68-109).

In a written opinion dated February 22, 2016, the ALJ found that since the amended alleged onset date of disability, October 5, 2012, the Plaintiff had the following severe impairments: ulcerative colitis, obesity, depression, and anxiety. (Tr. 47-48). The ALJ said he met insured status requirements through December 31, 2016. (Tr. 47). However, after reviewing the evidence in its entirety, the ALJ determined that since the amended alleged onset date of disability, the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 49-51). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) except as follows:

> [T]he claimant can occasionally climb, balance, crawl, kneel, stoop, [and] crouch. In addition, the claimant can perform simple, routine, repetitive tasks in a setting where interpersonal contact is incidental to the work performed. The claimant can respond to supervision that is simple, direct, and concrete.

(Tr. 51-58). With the help of a vocational expert (VE), the ALJ determined that since October 5, 2012, Plaintiff was unable to perform his past relevant work as an order filler. (Tr. 59). The ALJ also determined that the Plaintiff – born October 17, 1965 – was categorized as younger individual, age 45-49, prior to the established disability onset date of October 5, 2012; but that on October 16, 2015, the Plaintiff's age category changed to an individual closely approaching advanced age. (Tr. 59). Ultimately, the ALJ determined that prior to October 16, 2015, the date the Plaintiff's age category changed, there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed, such as: ordinance check weigher, motor polarizer, and paper label assembler. (Tr. 59-60). Therefore, the ALJ

determined that Plaintiff was not disabled prior to October 16, 2015. (Tr. 60). However, beginning on October 16, 2015, the date Plaintiff's age category changed, there were no longer any jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 60). Therefore, the ALJ ultimately concluded that while Plaintiff was not disabled prior to October 16, 2015, he became disabled on that date and continued to be disabled through February 22, 2016, the date of his decision. (Tr. 60).

Subsequently, on April 12, 2016, Plaintiff requested a review of the hearing decision by the Appeals Council. (Tr. 15). After reviewing additional evidence submitted by Plaintiff, the Appeals Council denied the request on July 28, 2016. (Tr. 1-4). Plaintiff filed a Petition for Judicial Review of the matter on September 30, 2016. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 12, 13).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.    Evidence Submitted:

At the hearing before the ALJ on December 8, 2015, Plaintiff testified that he was born in 1965. (Tr. 71). Plaintiff testified that he had a high school education. (Tr. 71). Plaintiff's past relevant work consisted of work as an order filler, also known as a warehouse order selector. (Tr. 103).

Prior to the relevant time period, in 1990, Plaintiff was diagnosed with ulcerative colitis. (Tr. 445). In December of 1990, Plaintiff underwent a total abdominal colectomy and proctectomy with ileostomy formation. (Tr. 466). In 1997 and 1998, Plaintiff was treated for

reflux and continued to be treated for complications from his abdominal surgeries, including hernia repair. In 2010, Plaintiff was treated for low back pain, which improved with back exercises. (Tr. 593). A previous MRI showed multilevel degenerative disc disease with possible neural foraminal encroachment at L4-5 consistent with possible S1 radiculopathy. (Tr. 593). An additional MRI of the lumbar spine from April of 2010, showed the following: 1) disc degeneration a L2-3 with minimal diffuse disc bulging and very slight bilateral neural foraminal encroachment but no central canal stenosis or focal disc herniation; 2) focal central annular tear and L3-4 with small focal central disc herniation encroaching on the thecal sac slightly; 3) left posterior annular tear at L4-5 with a far lateral left-sided intraforaminal small disc herniation suspected encroaching on the neural foramen on the left; and 4) small focal central annular tear at L5-S1 with a small disc herniation encroaching on the anterior epidural fat and possibly slightly encroaching on the right S1 nerve root at this level. (Tr. 597-598). In September of 2010, Plaintiff was diagnosed with obstructive sleep apnea and received CPAP therapy. During the month of January 2011, Plaintiff was treated for nausea, vomiting, diarrhea and dehydration; underwent an additional hernia repair procedure; and was admitted to the hospital for observation. (Tr. 407, 562, 563, 573, 602-606).

During the relevant time period, Plaintiff underwent hernia repair on February 2, 2011. (Tr. 574). A pathology report from that procedure showed parastomal hernia sac with mild fibrosis, but no granuloma or malignancy. (Tr. 574). An abdomen x-ray performed on February 4, 2011, showed dilated small bowel loops with no significant colonic gas seen, which was indicative of a small bowel obstruction. (Tr. 609). Plaintiff saw Dr. Stephen Wood at Fayetteville Surgical Associates on February 15, 2011, and February 25, 2011, for follow up appointments. (Tr. 624-626). Dr. Wood completed an Attending Physician Statement on

February 17, 2011, where he opined that Plaintiff was suffering from gallstones and recommended treatment to surgically remove the gallbladder. (Tr. 638). Dr. Wood further indicated that Plaintiff was unable to perform his job duties because he was unable to lift more than ten pounds and could not push or pull. He stated Plaintiff was capable of returning to work on June 7, 2011. (Tr. 639).

In March 2011, Plaintiff was seen by Dr. Michael Rogers. Dr. Rogers' clinic notes indicated the following: that Plaintiff was doing well following the hernia repair; that Plaintiff had a recent hospital stay for diarrhea; that the biopsies of the duodenum and small bowel showed acute inflammation and presence of PMN in stool specimen; that symptoms had resolved and were more consistent with acute gastroenteritis; and that Plaintiff had lost his job due to his restriction from any manual lifting. (Tr. 581).

On April 5, 2011, Plaintiff was seen by Cheryl Walsh, APN with complaints of abdomen pain, nausea, and vomiting. (Tr. 578). After labs and a CT yielded normal results, Nurse Walsh recommended an ultrasound of the gallbladder. (Tr. 578). On April 8, 2011, Plaintiff had a follow-up visit with Dr. Wood, where clinic notes indicated Plaintiff was feeling better, that Plaintiff's stoma had improved, and that Plaintiff had gallstones. (Tr. 630). An abdominal ultrasounds revealed cholelithiasis (gallstones) and two hepatic cysts. (Tr. 566). Following the ultrasound, Nurse Walsh referred Plaintiff to Dr. Wood for a consult regarding a cholecystectomy (gallbladder removal). (Tr. 577). On April 26, 2011, Plaintiff saw Dr. Wood, who performed an open cholecystectomy finding evidence of multiple multifaceted stones of the gallbladder. (Tr. 621-622). Pathology reports confirmed chronic cholecystitis (inflammation of the gallbladder), cholesterolosis (accumulation of cholesterol in the cells lining the gallbladder wall), and cholelithiasis (gallstones). (Tr. 620). In May of 2011, Plaintiff

saw Dr. Wood again for a follow-up visit, and in June of 2011, Dr. Wood completed an Attending Physician Statement. In that statement, Dr. Wood noted the following: Plaintiff's recent gallbladder removal surgery; that Plaintiff could not lift anything over ten pounds, nor could he push or pull due to the recurrence of his hernia; and that although Plaintiff was released to return to work on June 7, 2011, Plaintiff had been discharged from his job because of his restrictions on lifting. (Tr. 638-639).

On July 26, 2011, Dr. Winston Brown, Ph.D., performed a Psychiatric Review Technique. (Tr. 539-551). In that review, he determined that Plaintiff had only mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. (Tr. 549). Plaintiff was found to have no repeated episodes of decompensation. (Tr. 549). The report also concluded that Plaintiff's mental impairment was not severe. (Tr. 539-551). On that same day, Dr. Jonathan Norcross, a non-examining medical consultant, completed a Physical RFC, in which he determined that Plaintiff was capable of performing sedentary work. (Tr. 559).

On September 14, 2011, Plaintiff saw Dr. Michael Rogers for a follow up appointment. (Tr. 641). Dr. Rogers' notes indicated that Plaintiff was doing well and that there was no evidence of recurrence of his hernia. Dr. Rogers noted that Plaintiff's obesity was becoming more of a health issue for him, and as a result, Dr. Rogers recommended a dietary and exercise program. (Tr. 641). On September 16, 2011, Plaintiff saw Dr. James S. Salmon at the Fayetteville Diagnostic Clinic for complaints of abdomen bloating. Dr. Salmon prescribed medication and an increase in physical activity, and recommended checking Plaintiff's thyroid due to his inability to lose weight. (Tr. 642).

Plaintiff did not see Dr. Salmon, or any other doctor, again until April of 2012. (Tr. 650). At that time, Dr. Salmon noted that Plaintiff needed disability paperwork to be refiled and that Plaintiff was experiencing symptoms of depression. (Tr. 650). He recommended medication for the depression and an exercise program. (Tr. 650). On May 4, 2012, Dr. Salmon's notes indicated that Plaintiff's depression had improved with medication and that he still needed more information on Plaintiff's past surgeries in order to complete the disability application. (Tr. 651). Dr. Salmon completed a Physician Attending Statement on May 30, 2012, wherein he recommended that Plaintiff not lift anything as a result of his recurrent hernia and that he could sit, stand, and walk for one hour intermittently. (Tr. 657-658). He also limited Plaintiff to no twisting, bending, stooping, pushing or pulling. (Tr. 658).

On June 21, 2012, Plaintiff underwent a Mental Diagnostic Evaluation by Dr. Gene Chambers, Ph.D. Dr. Chambers opined that Plaintiff's depressed mood resulted in mild limitations in his ability to communicate and interact in a socially adequate manner, mild limitations on Plaintiff's capacity to sustain persistence in completing tasks, and mild limitations on Plaintiff's capacity to complete work-like tasks within an acceptable time frame. (Tr. 652-656). However, Dr. Chambers also opined that Plaintiff's capacity to cope with typical cognitive demands of basic work tasks, as well as Plaintiff's capacity to communicate in an intelligent and effective manner, both appeared to be within normal limits. (Tr. 652-656). Dr. Chambers diagnosed Plaintiff with major depression, single episode, and generalized anxiety disorder. (Tr. 652-655). He noted that Plaintiff had seen improvement while taking Wellbutrin. (Tr. 652-655).

Almost one year later in April of 2013, Plaintiff saw Dr. Salmon for abdomen discomfort. (Tr. 396). Plaintiff's weight at that time was 250 pounds. (Tr. 396). In October

of 2013, Plaintiff saw Dr. Salmon for low back pain and pain down his left leg. (Tr. 406). Dr. Salmon assessed Plaintiff with degenerative disc disease and lumbar and cervical pain. (Tr. 406). Dr. Salmon also completed an Attending Physicians Statement on April 19, 2013, where Dr. Salmon opined that Plaintiff could stand, walk, or sit for one hour total, intermittently; that he was prohibited from lifting or carrying any weight; and that he was prohibited from twisting, bending, stooping, pushing or pulling due to his hernia. (Tr. 660-661). Dr. Salmon also stated that Plaintiff could not work and was not expected to improve. (Tr. 661).

Plaintiff did not see Dr. Salmon again for his low back pain until May 9, 2014. (Tr. 394). At that visit, Plaintiff reported that his pain was not controlled by hydrocodone and that it was interfering with his sleep. (Tr. 394). Dr. Salmon's notes reflect that Plaintiff was still experiencing pain, nausea, vomiting and some distension; that Plaintiff was still under lifting restrictions; that Plaintiff was considered permanently disabled; and that Plaintiff would need to fill out yearly paper work. (Tr. 395).

A MRI of Plaintiff's lumbar spine taken on May 15, 2014, revealed the following: 1) multilevel lumbar spondylosis "which had progressed at the L3-4 and L4-5 levels where there was mild to moderate bilateral lateral recess narrowing"; and 2) degenerative disc and facet disease at the L5-S1 level "which has not significantly changed, but results in mild bilateral lateral recess narrowing and effacement of the ventral thecal space where the lower sacral nerve roots course and which may be impinged, unchanged." (Tr. 375-376).

In August of 2014, Plaintiff was seen at that Northwest Arkansas Neuroscience Institute for pain in his low back, lower extremity, weakness in the left leg, and numbness in the anterior thigh. (Tr. 381, 384). Clinic notes reflected that Plaintiff's weight was 271 pounds

and was likely a factor in the exacerbation of his back pain. (Tr. 382, 385). Plaintiff declined a referral to neurology; however, pain management and physical therapy were recommended. (Tr. 386). Ultimately, Plaintiff received a steroid injection for his back pain. (Tr. 383). On September 16, 2014, Northwest Arkansas Neuroscience Institute clinic notes reflected that the steroid injection provided some relief and that a second steroid injection was ordered. (Tr. 378-380). In addition, clinic notes reflected Plaintiff's obesity and his ostomy belt. (Tr. 378).

A few days later, on September 19, 2014, Plaintiff saw Dr. Salmon for pain around his abdomen. Dr. Salmon's notes indicated that Plaintiff continued to be totally disabled due to his chronic back problem and his herniated ostomy site. (Tr. 393).

On September 26, 2014, non-examining medical consultant, Dr. Karmen Hopkins, completed a Physical RFC Assessment of Plaintiff, where she found that Plaintiff was capable of sedentary work with postural limitations. (Tr. 145).

On October 15, 2014, Plaintiff underwent a Mental Diagnostic Evaluation by Dr. Terry Efird, who diagnosed him with major depressive disorder and general anxiety disorder, with a GAF score of 50-60. (Tr. 421). Dr. Efird opined the following: that Plaintiff could perform activities of daily living, but was impaired by pain; that Plaintiff was socially withdrawn, but visited with his wife's parents once a week; that Plaintiff communicated and interacted in a socially adequate and reasonably intelligible manner; that Plaintiff could perform basic cognitive tasks required for basic work like activities; that Plaintiff completed most tasks; that Plaintiff had the mental capacity to persist with tasks if desired; and that Plaintiff was capable of performing basic work like tasks within a reasonable time frame. (Tr. 421-422).

On October 17, 2014, non-examining medical consultant, Dr. Jerry R. Henderson, Ph.D., performed a Psychiatric Review Technique. (Tr. 142). Dr. Henderson opined that Plaintiff had mild restriction on activities of daily living and moderate restriction in difficulty in both maintaining social functioning and maintaining concentration, persistence or pace. (Tr. 142). Plaintiff was found to have no repeated episodes of decompensation. (Tr. 142). In a corresponding Mental RFC, also completed by Dr. Henderson, he concluded that the medical record supported an unskilled mental rating. (Tr. 147).

On November 14, 2014, Plaintiff saw Dr. Scott Burch at the Fayetteville Diagnostic Clinic for low back pain. (Tr. 427). Plaintiff reported that he was experiencing pain down his left leg, which had worsened with the onset of cooler weather. (Tr. 433). Plaintiff was prescribed steroids and Flexeril and his pain medication dosage was increased. (Tr. 433). Plaintiff's weight was recorded at 276 pounds. (Tr. 432). In December of 2014, Plaintiff was seen by Lindsay R. Kames, APRN, for a sore throat. (Tr. 426). At that visit, Plaintiff had a normal physical exam with a weight recorded at 284 pounds. (Tr. 430).

Seven months later, in July of 2015, Plaintiff saw Dr. James W. Norys at the Fayetteville Diagnostic Clinic for his back pain, where he was assessed with severe spinal stenosis. (Tr. 674-675). Clinic notes reflected that Plaintiff's problem was stable with symptoms aggravated by daily activities. (Tr. 674).

On November 13, 2015, Plaintiff saw Dr. Salmon for back pain, numbness in fingers and hand, and left inguinal pain. (Tr. 676). Plaintiff's physical exam revealed mild para spinal tenderness and obesity. (Tr. 678). He was assessed with epididymal pain, low back pain without sciatica, and left ulnar nerve entrapment. (Tr. 679). On November 18, 2015, Plaintiff

saw Dr. Michael Morse at Neurological Associates, where he was assessed with cervical neck pain, carpal tunnel syndrome of the left arm, and ulnar neuropathy of the left upper extremity. (Tr. 689-691). Plaintiff's physical exam yielded normal results. (Tr. 690). The next day on November 19, 2015, a MRI was performed on Plaintiff's neck. (Tr. 692). The MRI showed mild spondylitic changes at C4-5 and C5-6 resulting in mild neural exit foraminal narrowing on the right. (Tr. 693).

On November 24, 2015, at his wife's request, Plaintiff underwent a psychological evaluation by Dr. Regina Thurman. (Tr. 664). Dr. Thurman noted that Plaintiff had received mental health treatment in 2014 and 2015; however, he had not received any inpatient treatment. (Tr. 664). Dr. Thurman opined that Plaintiff's overall mental function was adequate and assessed him with major depressive disorder, recurrent episode with anxious distress. (Tr. 665). She noted that Plaintiff was non-compliant with his psychotropic medication for depression and scheduled follow-up therapy to reduce overall level, frequency, and intensity of distress. (Tr. 665).

On November 29, 2015, Dr. James Salmon completed a Medical Source Statement, wherein he opined that Plaintiff could only occasionally lift ten pounds; could stand and/or walk one hour in an eight hour work day; could sit a total of one hour in an eight hour work day; had limited ability to push and/or pull in upper and lower extremities; would require five or more bathroom breaks a day; could not climb, balance, squat, kneel, crouch, bend, or stoop; and must avoid all exposure to environmental hazards. (Tr. 680-681). Dr. Salmon noted the numerous revisions of Plaintiff's ostomy site due to recurrent hernias; that the surgeries had been unsuccessful; and that Plaintiff's surgeons had advised him to limit activities. (Tr. 682). Dr. Salmon also completed an Abbreviated Physical RFC Assessment wherein he concluded

that Plaintiff could not sit for six hours of an eight hour work day; that he could not sit/stand/walk in combination for eight hours in an eight hour work day; that he could not perform part-time work activities of any nature for more than ten hours in a forty hour work week; that he required four or more unscheduled work breaks in an eight hour work day due to physical restrictions; that he had significant limitations in the ability to reach/push/pull bilaterally in the upper extremities; and that he had significant limitations in the ability to handle and work with small objects with both hands. (Tr. 683). Dr. Salmon also completed a patient information form, where he noted that he had treated Plaintiff from January of 2011 through November of 2015 for ulcerative colitis with colectomy and recurrent hernias and repairs. (Tr. 684). On the form, Dr. Salmon recommended no lifting and standing for only brief periods and opined that Plaintiff could only sit, stand, walk, or climb for one hour in an eight hour work day. (Tr. 685). Dr. Salmon also opined that Plaintiff could not twist, bend, or stoop; could not reach above shoulder level; could not reach front and side at desk level; could not perform fine finger movements; could not perform eye/hand movements; could not lift any amount of weight; could not push or pull; and could not operate a motor vehicle. (Tr. 685). Lastly, Dr. Salmon indicated that while Plaintiff had reached maximum medical improvement, Plaintiff could not operate a motor vehicle and was not advised to return to work given Dr. Salmon's restriction on lifting, pulling, bending, or twisting. (Tr. 685-686).

Also in November of 2015, Dr. Kamra E Mays, Ph.D., completed a Mental RFC Assessment where she opined that Plaintiff had no useful ability to function on a sustained basis in all areas except the following: sustain an ordinary routine without supervision; respond appropriately to supervision, co-workers, and usual work settings; make simple work-related decisions; interact appropriately with the general public; accept instructions and respond

appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; follow work rules; behave in an emotionally stable manner; and relate predictably in social situations. (Tr. 560).

In March of 2015, Dr. Jon Etienne Mourot, Ph.D. completed a Mental RFC Assessment on Plaintiff, where he determined that there was no evidence of severe cognitive mental impairment or adaptive functioning for occupational purposes and concluded Plaintiff's impairment was not severe. (Tr. 160). Dr. Janet Cathey also performed a Physical RFC Assessment in March of 2015, where she affirmed the September 26, 2014, assessment. (Tr. 163).

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent

13

positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. § 404.1520(a)(4). Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520(a)(4)(v).

**IV.    Discussion:**

Plaintiff makes the following arguments on appeal: 1) the ALJ erred in his reliance upon the vocational expert's response to his hypothetical; and 2) the ALJ erred in his Step Two determination.[3]

**A.    Plaintiff's Impairments:**

Plaintiff argues that the ALJ erred in his Step Two by failing to find that Plaintiff's musculoskeletal impairments were medically determinable and met severity.  At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c). While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted). To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p. The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).

While the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments, the ALJ specifically discussed the alleged impairments in the decision, and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe. See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairment as

---

[3] The Court has re-ordered Plaintiff's arguments to correspond with the five-step analysis utilized by the Commissioner.

"severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); see also 20 C.F.R. § 404.1545(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 404.1523(c) (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity"). Based on a review of the record, the Court finds the ALJ did not error in setting forth Plaintiff's severe impairments during the relevant time period.

### B. Subjective Complaints and Symptom Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. The record reflects that Plaintiff completed a Function Report on February 9, 2017, wherein he reported that he could manage his personal care with the exception of some assistance putting on socks and shoes, occasional help with showering, and assistance when changing his ostomy pouch.

(Tr. 289). Plaintiff reported that his daily routine consisted of letting the dogs outside, feeding them, waking his wife, making her coffee, lying on the couch, watching television, eating lunch and waiting on his wife to come home.  (Tr. 288).  Plaintiff stated that he prepared his own meals, folded laundry, made coffee, and washed dishes in stages.  (Tr. 290).  Plaintiff reported that he no longer drove a car, but could ride in a car, could shop in stores for food on a weekly basis, could count change, and could use a money order or checkbook.  (Tr. 291).  Plaintiff's wife reminded him of doctor appointments and would regularly take him to those appointments.  (Tr. 292).  Plaintiff regularly spent time with his wife and talked to his sister on the telephone. (Tr. 292).   He reported that he could walk approximately 100 yards before needing to stop and rest, and his medication dictated how long he could concentrate and pay attention.  (Tr. 293).  Although Plaintiff reported that he needed help caring for himself, he testified at the hearing before the ALJ on December 8, 2015, that he took care of his wife, who suffered from diabetes.  (Tr. 94).

Based on a thorough review of the record, it is clear that Plaintiff suffers some degree of limitation; however, he has not established that he is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### C.    The ALJ's RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also

factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007), citing Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (internal citations omitted).

The SSA regulations set forth how the ALJ weighs medical opinions. The regulations provide that "unless [the ALJ] give[s] a treating source's opinion controlling weight ... [the ALJ] consider[s] all of the following factors in deciding the weight [to] give to any medical opinion": (1) examining relationship; (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and, (6) "any factors [the applicant] or others bring[s] to [the ALJ's] attention." 20 C.F.R. § 404.1527(c). The regulations provide that if the ALJ finds "that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the*

*applicant's] record,* [the ALJ] will give it controlling weight." Id. at § 404.1527(c)(2) (emphasis added).

Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

### D.    Hypothetical Question to the Vocational Expert:

Plaintiff asserts that the ALJ erred in his reliance upon the vocational expert's response to his hypothetical. At the hearing before the ALJ, Vocational Expert (VE), Dr. Deborah Steele, testified. During examination by the ALJ, the ALJ posed the following hypothetical question to the VE:

Q: A person at the alleged onset date as a younger individual, who has since crossed the grid. High school education, the past relevant work you just told me about. In the first hypothetical, the person can do sedentary work as defined by the regulation with additional limitations: occasional climb, balance, crawl, kneel, stoop, crouch. Is limited to simple, routine, repetitive tasks in a setting where interpersonal contact is incidental to the work performed. Can respond to supervision that is simple, direct and concrete. So, it would appear that person could not return to the past relevant work, correct?

A: That is correct, your honor.

Q: Would there be work in the economy a person with those limitations could do?

A: Let me take a look here.

Q: And I need three examples, if you have them.

A: Okay, your honor. Your honor, there would be an ordnance check weigher and that would be DOT 737.687-026. That would be OES of 519061. Sedentary, unskilled, SVP of 2. In the region, the State of Arkansas, there are approximately 145. Nationally, there are approximately 11,850. Excuse me. Also there would be a loader polarizer and that would be DOT 715.687-090; OES of 519198. Sedentary, unskilled, SVP of 2. In the region, the State of Arkansas there are approximately 130. Nationally, there are approximately 5,400. Also, excuse me, there would be a paper label assembler and that would be DOT 734.687-018. OES 519199. Sedentary, unskilled, SVP of 2. In the

region, the State of Arkansas there are approximately 350. Nationally, there are approximately 24,240. Would you like more, your honor[?]

Q: No that's sufficient. Thank you. …

(Tr. 104-105). At the outset of the VE's testimony, the ALJ asked her, as part of her testimony, to explain any inconsistencies, if at any time during her testimony, any of her responses were inconsistent with the DOT, to which the VE responded, "Yes, your honor."

Plaintiff argues that the ALJ did not meet his burden of production at Step Five of the evaluation process because the VE's testimony concerning job numbers was derived from the U.S. Publishing's Occupational Employment Quarterly. As set forth above, the VE testified that in regard to the ALJ's hypothetical, with limitations mirroring those in the RFC, an individual with Plaintiff's vocational profile could perform work as an ordnance check weigher, a motor polarizer, and a paper label assembler. The VE provided the three DOT job titles with OES (Occupational Employment Statistics) groupings codes and stated that approximately 11,850 (ordnance check weigher); 5,400 (motor polarizer); and 24,240 (paper label assembler) of these jobs existed in the national economy. (Tr. 104-105). Contrary to Plaintiff's assertion, none of the jobs identified require postural activities such as climbing, balancing, crawling, kneeling, stooping, and crouching, and thus, there was no conflict between the VE's testimony and the DOT. Dictionary of Occupational Titles §§§ 737.687-026, 715.687-090, 734.687-018. As a result, there was no error on the part of the ALJ, and Plaintiff's assertion is without merit.

## V.    Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C.**

**§ 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 9th day of November, 2017.


/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE